No. 20-1632

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————————

PHILADELPHIA BAIL FUND,

*Plaintiff-Appellee,*

v.

ARRAIGNMENT COURT MAGISTRATE JUDGES FRANCIS BERNARD,
SHEILA BEDFORD, KEVIN DEVLIN, JAMES O'BRIEN, CATERIA MCCABE,
and ROBERT STACK; and PRESIDENT JUDGE PATRICK DUGAN,

*Defendant-Appellants,*

SHERIFF ROCHELLE BILAL,

*Defendant.*

———————————

On Appeal from the U.S. District Court for the
Eastern District of Pennsylvania (No. 19-cv-3110-HB)

———————————

## BRIEF FOR APPELLEE
## PHILADELPHIA BAIL FUND

———————————

MICHAEL BERRY
PAUL J. SAFIER
SHAWN F. SUMMERS
  *Ballard Spahr LLP*
  *1735 Market Street, 51st Floor*
  *Philadelphia, PA 19103*
  *Tel.:  215-665-8500*
  *Fax:  215-864-8999*

NICOLAS Y. RILEY
ROBERT D. FRIEDMAN
  *Institute for Constitutional Advocacy &*
    *Protection*
  *Georgetown University Law Center*
  *600 New Jersey Avenue NW*
  *Washington, DC 20001*
  *Tel.:  202-662-4048*
  *Fax:  202-662-9248*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 1

STATEMENT OF JURISDICTION .................................................................... 3

STATEMENT OF THE ISSUE ........................................................................... 3

STATEMENT OF THE CASE ............................................................................. 4

     A.     Philadelphia's Bail-Setting Process ................................................ 4

     B.     The Bail Fund's Inability to Obtain a Complete Record of the Bail Hearings ........................................................................................ 6

     C.     Procedural History .......................................................................... 7

SUMMARY OF ARGUMENT ......................................................................... 10

STANDARD OF REVIEW ............................................................................... 14

ARGUMENT ...................................................................................................... 14

I.     The challenged rules infringe the public's First Amendment right of access to bail hearings in Philadelphia ................................................ 14

     A.     The First Amendment protects the public's right to a comprehensive record of proceedings held in open court. .............. 14

     B.     The challenged rules prevent the public from compiling a comprehensive record of Philadelphia bail hearings. ...................... 18

     C.     None of the publicly available sources that the bail magistrates have identified provides a viable substitute for an actual record of the proceedings. ............................................................................. 23

II.     The case law cited by the magistrates is inapposite. ............................. 27

     A.     The magistrates' cited cases involved different types of proceedings and different methods of recording. ............................. 27

B.     The magistrates' reliance on cases addressing courtroom closures only reaffirms that their stated justifications for the audio-recording ban are inadequate. ...................................................... 31

III.    The blanket ban on audio-recording bail hearings is not necessary to protect the rights of criminal defendants or to promote decorum .................... 33

A.     The magistrates' conclusory assertions about the need to protect criminal defendants' rights cannot justify the ban on audio-recording bail hearings. ............................................................... 34

B.     The magistrates' assertion that the audio-recording ban promotes decorum is likewise unsupported and inadequate. .................................. 41

IV.    The magistrates' reliance on the public-forum doctrine is misplaced. .............. 43

A.     The public-forum doctrine is inapplicable here. ........................................ 44

B.     Even if the public-forum doctrine applied here, the Bail Fund would still prevail. ....................................................................... 46

V.     The magistrates overstate the impact of the District Court's ruling. ................ 48

CONCLUSION ............................................................................. 49

COMBINED CERTIFICATIONS

ADDENDUM:  PERTINENT STATUTES & RULES

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Berner v. Delahanty,*
  129 F.3d 20 (1st Cir. 1997) ............................................................ 45

*Chandler v. Florida,*
  449 U.S. 560 (1981) ..........................................................28, 29, 40

*Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist.,*
  386 F.3d 514 (3d Cir. 2004) ........................................................... 46

*Conway v. United States,*
  852 F.2d 187 (6th Cir. 1988) ......................................................... 29

*Cox Broad. Corp. v. Cohn,*
  420 U.S. 469 (1975) ................................................................ 17, 33

*Craig v. Harney,*
  331 U.S. 367 (1947) ............................................................32, 33, 48

*El Vocero de Puerto Rico v. Puerto Rico,*
  508 U.S. 147 (1993) ...................................................................39-40

*Faush v. Tuesday Morning, Inc.,*
  808 F.3d 208 (3d Cir. 2015) ........................................................... 14

*Fields v. City of Philadelphia,*
  862 F.3d 353 (3d Cir. 2017) ............................................22, 23, 36, 48

*Gannett Co. v. DePasquale,*
  443 U.S. 368 (1979) ..................................................................... 33

*Globe Newspaper Co. v. Superior Court,*
  457 U.S. 596 (1982) ................................................................ 17, 41

*Goldschmidt v. Coco,*
  413 F. Supp. 2d 949 (N.D. Ill. 2006) .............................................. 17

*Huminski v. Corsones,*
  396 F.3d 53 (2d Cir. 2005) ............................................................ 45

*In re Avandia Marketing,*
  924 F.3d 662 (3d Cir. 2019) ........................................................... 15

*In re Globe Newspaper Company,*
  729 F.2d 47 (1st Cir. 1984) ...........................................31, 32, 36

*Int'l Soc. for Krishna Consciousness, Inc. v. New Jersey Sports & Exposition Auth.*,
   691 F.2d 155 (3d Cir. 1982) ...................................................... 45, 46

*Mezibov v. Allen*,
   411 F.3d 712 (6th Cir. 2005) ...................................................... 45

*Miller v. City of Cincinnati*,
   622 F.3d 524 (6th Cir. 2010) ...................................................... 47

*Mills v. Alabama*,
   384 U.S. 214 (1966) ...................................................... 14

*NAACP v. City of Philadelphia*,
   834 F.3d 435 (3d Cir. 2016) ...................................................... 47, 48

*Nebraska Press Association v. Stuart*,
   427 U.S. 539 (1976) ...................................................... 36, 38, 40

*Nixon v. Warner Communications, Inc.*,
   435 U.S. 589 (1978) ...................................................... 27, 28

*Northeast Pa. Freethought Soc'y v. County of Lackawanna Transit Sys.*,
   938 F.3d 424 (3d Cir. 2019) ...................................................... 46

*Oklahoma Publishing Co. v. District Court*,
   430 U.S. 308 (1977) ...................................................... 39

*PG Pub. Co. v. Aichele*,
   705 F.3d 91 (3d Cir. 2013) ...................................................... 44

*Pomicter v. Luzerne Cty. Convention Ctr. Auth.*,
   939 F.3d 534 (3d Cir. 2019) ...................................................... 46, 47

*Press-Enterprise Co. v. Superior Court*,
   478 U.S. 1 (1986) ...................................................... 15, 27, 34

*Richmond Newspapers, Inc. v. Virginia*,
   448 U.S. 555 (1980) ...................................................... 14

*Sheppard v. Maxwell*,
   384 U.S. 333 (1966) ...................................................... 14

*Skilling v. United States*,
   561 U.S. 358 (2010) ...................................................... 38

*Tribune Review Publishing Co. v. Thomas*,
   254 F.2d 883 (3d Cir. 1958) ...................................................... 29

*United States v. A.D.*,
   28 F.3d 1353 (3d Cir. 1994) ...................................................... 31, 40-41, 43

*United States v. Antar,*
  38 F.3d 1348 (3d Cir. 1994)..........................................................15, 16, 17, 20

*United States v. Cabra,*
  622 F.2d 182 (5th Cir. 1980) ...................................................................... 17

*United States v. Columbia Broadcasting System,*
  497 F.2d 102 (5th Cir. 1974) ...................................................................... 17

*United States v. Hastings,*
  695 F.2d 1278 (11th Cir. 1983) ................................................................... 29

*United States v. Kerley,*
  753 F.2d 617 (7th Cir. 1985) ...................................................................... 30

*United States v. Martin,*
  746 F.2d 964 (3d Cir. 1984)............................................................16, 20, 28, 37

*United States v. Simone,*
  14 F.3d 833 (3d Cir. 1994)........................................................................ 15

*United States v. Yonkers Board of Education,*
  747 F.2d 111 (2d Cir. 1984)....................................................................... 30

*Whiteland Woods, L.P. v. Township of West Whiteland,*
  193 F.3d 177 (3d Cir. 1999)..................................................................passim

## Statutes

28 U.S.C § 753(b) ........................................................................................ 28

## Other Authorities

Lise Olsen, *Videotapes Reveal Flaws in Harris County Bail Bond Hearings,*
  Hous. Chron. (Nov. 30, 2016) ..................................................................... 37

*Public Access to Court Electronic Records, Digital Audio Recording Project* .............................. 37

Taylor Jones, Jessica Rose Kalbfeld, Ryan Hancock, & Robin Clark,
  *Testifying While Black: An Experimental Study of Court Reporter Accuracy in
  Transcription of African American English,* 95 Language e216 (June 2019) ................... 20

## Rules

Alaska Admin. R. 9, 35 ................................................................................. 37

Fla. R. Jud. Admin. 2.450 ............................................................................. 37

Md. R. 16-502 ............................................................................................ 37

Neb. S. Ct. R. 6-1405 .................................................................................. 37

N.H. R. Crim. P. 53 ............................................................................................ 37

N.M. Sup. Ct. R. 23-107 .................................................................................... 37

N.C. R. Super. & Dist. Cts. 15 ........................................................................... 37

N.D. Sup. Ct. Admin. R. 39 & 40 ...................................................................... 37

Ohio R. of Superintendence for Cts. 12(A) ...................................................... 37

Local Arraignment Court Magistrate Rule 7.09 ................................................. 7

Pa. R. Crim. P. 112(C) ............................................................................... 1, 7, 19

Pa. R. Crim. P. 523 ........................................................................................ 4, 24

Pa. Rule of Judicial Administration 1910 ........................................................... 7

Tenn. Sup. Ct. R. 30 .......................................................................................... 37

Utah Code Jud. Admin. R. 4-202.03, 4-202.08 ................................................. 37

Vt. R. Crim. P. 53.1(f) ........................................................................................ 37

## Constitutional Provisions

U.S. Const. amend. VI ........................................................................................ 40

# INTRODUCTION

Over the past several years, Philadelphia's citizens and elected officials have been engaged in an ongoing public discussion about the fairness of the City's criminal justice system.  One of the focal points of that discussion is the City's process for determining whether someone accused of a crime will spend the days, weeks, and months after an arrest awaiting trial at home or in jail.  That process comes to a head dozens of times each day in a basement courtroom at Philadelphia's Criminal Justice Center.  There, a group of magistrate judges, prosecutors, and public defenders hold round-the-clock hearings to set bail for recent arrestees and, ultimately, decide who goes home and who remains in jail.

This case is about the public's ability to document what happens during those hearings, which occur entirely off the record.  No court reporter is present during the hearings and no transcripts or recordings are ever made available to the public.  Moreover, observers are prohibited from making any "stenographic, mechanical, [or] electronic recording[s]" of the hearings on their own.  Pa. R. Crim. P. 112(C).  As a result, public discourse surrounding the City's bail process rests on an incomplete understanding of what happens during those critical hearings.

The Philadelphia Bail Fund filed this suit to close that gap in public understanding.  The organization—which regularly engages with public officials, community leaders, and the media on bail-policy matters—challenges the restrictions on its ability to document bail hearings.  Specifically, the Bail Fund challenges a trio of

overlapping state-court rules that bar it from audio-recording the hearings and effectively deprive it of any opportunity to obtain a complete, verbatim record of the proceedings.

The District Court properly concluded that, under "the narrow circumstances present here," those rules violate the First Amendment. Relying on this Court's precedents, the District Court held that the Bail Fund would not be able to vindicate its right of access to a full record of the bail hearings unless it were able to audio-record proceedings (which would otherwise go undocumented). The court also held that the bail magistrates' stated justifications for prohibiting court recording were inapposite in the bail-hearing context and unsupported by the evidentiary record in this case. Although the court gave the magistrates an opportunity to cure the First Amendment violation by making official transcripts or recordings of the hearings available to the public, the magistrates filed this appeal instead.

The District Court's ruling should be affirmed. Although the magistrates attempt to cast the ruling as a radical departure from prior cases, the decision in fact rests on a straightforward application of settled First Amendment principles to the unique facts of this case. Contrary to the magistrates' characterizations of this case, the Bail Fund is not asserting an unfettered right to record all judicial proceedings of any kind. Nor is it asserting a right to film, photograph, or live-stream any proceedings. Rather, the Bail Fund's claim is much more modest: it asserts the right to create a comprehensive record of Philadelphia's bail hearings in a context in which

2

such a record would be otherwise unavailable. And, as the undisputed record in this case establishes, the only way the Bail Fund can obtain such a record is by making its own audio-recordings of the proceedings. The magistrates have not offered any evidence to suggest that allowing the Bail Fund to record the bail hearings would undermine the proceedings in any way. Nor have they identified a single case—from any court—rejecting a First Amendment right to audio-record proceedings that occur off the record. For those reasons, and others set forth below, the Bail Fund respectfully asks this Court to affirm the judgment of the District Court.

## STATEMENT OF JURISDICTION

Plaintiff Philadelphia Bail Fund invoked the District Court's original jurisdiction under 28 U.S.C. § 1331. On February 25, 2020, the District Court issued an order and opinion granting summary judgment to the Bail Fund. Joint Appendix (JA) 4-32. Defendants filed a timely notice of appeal on March 20. JA 1-2; Fed. R. App. P. 4(a). This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Pennsylvania court rules generally prohibit "the stenographic, mechanical, or electronic recording, or the recording using any advanced communication technology, of any [criminal] judicial proceedings by anyone other than the official court stenographer in a court case, for any purpose." Pa. R. Crim. P. 112(C). The question presented is whether that prohibition violates the First Amendment insofar as it bars the public from audio-recording the off-the-record bail hearings in Philadelphia.

# STATEMENT OF THE CASE[1]

## A.    Philadelphia's Bail-Setting Process

People who are arrested in Philadelphia are typically brought before a judge within twenty-four hours to determine their initial bail amount.  JA 58-60.  Those bail hearings, which are also known as "preliminary arraignments," take place in Philadelphia Municipal Court.  JA 57.  The public is not given any advance notice of the hearings or when any particular defendant's case will be heard.  Each hearing is held before an Arraignment Court Magistrate, or "bail magistrate," who is tasked with determining "whether to release [the arrestee], and what conditions, if any, to impose."  Pa. R. Crim. P. 523(a).  The criteria that the bail magistrates are supposed to consider in making that determination are set forth in Pennsylvania Rule of Criminal Procedure 523.  JA 60.

Bail hearings are held in a windowless courtroom in the basement of the City's Criminal Justice Center.  JA 59.  The magistrate, prosecutor, and public defender all appear in person, while the arrestee appears via a closed-circuit audio-visual link from the police precinct where he or she was booked into custody.  JA 59.  The prosecutor and the defender typically present arguments to the magistrate and answer any questions the magistrate has on the subject of bail.  JA 59-60.  Although the

---

[1]  The facts recounted in this section are based on the rules and practices that were in place prior to the global COVID-19 pandemic, which has resulted in recent (temporary) restrictions on public access to the Criminal Justice Center.

magistrates do not receive any written arguments prior to the hearing, they have access to information about the arrestee via reports prepared by the court's pretrial services division (which are preserved in an internal online database known as the Preliminary Arraignment Reporting System, or PARS). JA 58-59. Each hearing is very brief—typically less than four minutes in length. JA 61.

Bail magistrates do not issue opinions outlining the reasons for their bail decisions. Instead, at the conclusion of each hearing, the magistrate announces his or her decision and enters the bail determination into an online system (which is not publicly accessible), *see* JA 69-71, which then transfers the information to the court's online docketing system (which is publicly accessible), JA 60. If either party is dissatisfied with the magistrate's decision, that party may take an immediate appeal to a different Municipal Court judge. JA 61. The appeal is conducted over the phone, in the same courtroom, outside the presence of the arrestee (whose audio-visual link is terminated prior to the call). JA 61.

A bail magistrate is available to handle preliminary arraignments twenty-four hours per day, seven days per week. JA 58. The Municipal Court currently employs six bail magistrates, who sit in rotating shifts. JA 58. Collectively, the magistrates preside over roughly 30,000 bail hearings each year. JA 62. All of the hearings are held in open court and members of the press and the public are free to attend and take notes on the proceedings. JA 61.

**B.     The Bail Fund's Inability to Obtain a Complete Record of the Bail Hearings**

The Philadelphia Bail Fund is a nonprofit organization whose mission is to make Philadelphia's bail system more just.  JA 56-57, 121-23 (Declaration of Malik Neal).  The organization pursues that mission in a variety of ways, including by posting bail for people who cannot afford to do so on their own.  JA 121.  In addition, the Bail Fund operates an initiative called Philadelphia Bail Watch, which sends volunteers into bail hearings to observe and report on what they see.  JA 121-22.  The Bail Fund uses the information gathered by those volunteers to produce public reports aimed at educating Philadelphia's citizens and government officials about the City's bail practices.  JA 122.  Still, despite the Bail Fund's regular court-watching efforts, the organization is not able to obtain complete, verbatim accounts of the hearings.  JA 123-24.  Its volunteers take extensive notes on the proceedings but the rapid, back-to-back, jargon-filled nature of the hearings makes it impossible for them to document every point or word exchanged.  JA 123-24.

The impossibility of this task is consequential—both for the Bail Fund and for the public—because the Municipal Court itself does not create any transcripts of the hearings or the telephonic appeals.  Last year, the court began creating its own audio-recordings of the proceedings for the purpose of monitoring the bail magistrates' performance.  JA 116-17.  But those recordings are not considered part of the record and are not available to the parties, the public, or the press.  JA 117.

6

State and local court rules preclude members of the public from making their own recordings of the proceedings.  Pennsylvania Rule of Criminal Procedure 112(C) prohibits the public from making "stenographic, mechanical, [or] electronic recording[s]" of any criminal proceedings.  In addition, Pennsylvania Rule of Judicial Administration 1910(B) generally provides that "judges shall prohibit broadcasting, televising, recording or taking photographs in the courtroom."  And Local Arraignment Court Magistrate Rule 7.09 directs bail magistrates, in particular, to "prohibit broadcasting, televising, recording, or taking photographs in the Courtroom."  Violations of these rules are punishable by contempt.  JA 58.

## C.    Procedural History

In June 2019, the Bail Fund's director wrote to the President Judge of the Municipal Court, Patrick Dugan, to ask if the Bail Fund could be permitted to audio-record the bail hearings.  JA 66, 109 (6/14/2019 Email from Malik Neal).  In that request, the Bail Fund explained that its volunteers would, if granted permission to record, use "a small, handheld recording device that captures audio only (not video)." JA 109.  The organization also stated that it would be willing to let courthouse security inspect the device—which would be "silent" and have "no wireless/cellular capabilities"—before any volunteers began using it to record.  JA 109.  President Judge Dugan denied the Bail Fund's request, JA 66, 111 (6/17/2019 Email from President Judge Dugan), and the Bail Fund filed this suit the following month.

In its complaint, the Bail Fund asserted that the ban on audio-recording bail hearings violates the First Amendment. *See* JA 38-53 (Complaint).[2] It sought a declaratory judgment that the state and local court rules prohibiting the public from audio-recording criminal proceedings are unconstitutional as applied to preliminary arraignments in Philadelphia. *See* JA 45-46, 52. The complaint named the six bail magistrates, President Judge Dugan, and the Sheriff of Philadelphia as defendants.

In November 2019, after holding a hearing on the defendants' motions to dismiss, the District Court proposed that the parties enter into a factual stipulation to enable the court to resolve the case on cross-motions for summary judgment. The parties filed that factual stipulation, as well as several exhibits, in December 2019. JA 54-67 (12/11/2020 Stipulation); JA 68-115 (Exhibits); *see also* JA 116-18 (1/6/2020 Supplemental Stipulation). That same week, the defendants also filed their answers to the complaint and the Bail Fund filed a declaration from its director. JA 134, 121-24. The parties cross-moved for summary judgment shortly thereafter. JA 135.

In February 2020, the District Court issued an order and opinion granting summary judgment to the Bail Fund. JA 4-6 (Dist. Ct. Order); JA 7-32 (Dist. Ct. Opinion). The court held that "under the narrow circumstances present here" the prohibition on audio-recording the bail hearings violated the First Amendment by

---

[2] The Bail Fund was originally joined in this suit by a local journalist, Merry Reed, who subsequently had to withdraw from the case. Ms. Reed was voluntarily dismissed in December 2019. JA 135.

depriving the Bail Fund of an opportunity to create a comprehensive record of the proceedings. JA 28. The court cited, among other undisputed facts, the absence of any publicly available record of the proceedings and the fact that "attendance and notes alone are insufficient to comprehend the full import of these numerous and rapid hearings." JA 29. The court held that these and other factors, taken together, violate the Bail Fund's right of access under the First Amendment. JA 29-31.

In reaching that conclusion, the District Court rejected the bail magistrates' claim that the recording ban is necessary "to protect the privacy of the arrestee and his or her right to a fair trial." JA 27. The court reasoned that the recording ban does not actually protect those interests in the bail-hearing context because "bail hearings are presently open to the press and public," so "anything said at the hearing . . . can appear in the newspapers, on television, or on social media even if no audio recordings by the public are allowed." JA 27. In addition, the court noted, the magistrates never actually "articulated why the privacy of the arrestee at bail hearings is any more compelling than the privacy of an arrestee at later stages of the criminal process when judicial recordings are made and transcripts are produced." JA 27.

The District Court stayed the effective date of its order for forty-five days to give the Municipal Court an opportunity to cure the constitutional violation on its own terms by providing the public with access to official transcripts or recordings of the bail hearings. JA 31. Before the conclusion of that period, however, the Criminal Justice Center was forced to suspend public access to its proceedings for public-health

9

reasons, in response to the global COVID-19 pandemic.  In light of the evolving

public-health situation, the parties agreed to an additional sixty-day temporary stay of

the District Court's summary-judgment order.  JA 125 (4/7/2020 Stay Order).  That

stay expires on June 9, 2020.  JA 125.

## SUMMARY OF ARGUMENT

In most courts, hearings in criminal cases occur on the record.  Bail hearings in

Philadelphia, however, are different.  The public has no access to any record of the

hearings and no way to document what happened during the proceedings.  The

District Court here recognized that, under such a regime, members of the public must

be afforded a meaningful opportunity to create a record of the proceedings on their

own.  That judgment—which rests on the sound application of this Court's

precedents to the unique facts of this case—was correct and should be affirmed for

the reasons set forth below.

**I.**    The First Amendment protects the public's right of access to judicial

proceedings in criminal cases.  As this Court has recognized, that right encompasses

not just a right of physical access to the courtroom during a proceeding, but also a

right to a comprehensive record of the proceeding itself.  The ban on audio-recording

Philadelphia's off-the-record bail hearings violates that right.

To determine whether a restriction on the public's ability to record a

government proceeding violates the First Amendment, this Court examines "whether

the restriction meaningfully interferes with the public's ability to inform itself of the

proceeding." *Whiteland Woods, L.P. v. Township of West Whiteland*, 193 F.3d 177, 183 (3d Cir. 1999). That inquiry turns on whether "the public is granted alternative means of compiling a comprehensive record." *Id.* In this case, the public has no alternative means of compiling such a record. The challenged rules expressly prohibit members of the public from recording bail hearings in any "stenographic, mechanical, [or] electronic" format. And, as the District Court recognized, the undisputed evidence here establishes that the rapid, back-to-back nature of the hearings makes it impossible for the public to compile a full record of the proceedings through handwritten notes alone.

Rather than contest the public's inability to compile a complete record of the hearings, the bail magistrates argue that the public can obtain information about the proceedings through public records. But none of those records documents what the parties or magistrates actually said during the proceedings. The records do not capture, for instance, the arguments raised by the parties or the magistrate's rationale (or lack of a rationale) for the final bail determination. Given the shortcomings of these records, it is not surprising that the Municipal Court itself uses other tools— *including audio recordings*—to oversee the magistrates' performance.

**II.** The magistrates also rely on various cases holding that there is no constitutional right to record judicial proceedings. But, critically, none of the cases they cite involved the rare species of court proceeding at issue here—that is, one that occurs entirely off the record. What's more, almost all of their cited cases involved

11

methods of recording (such as video or photography) that raise very different

concerns than audio-recording. And most of the cases rested on rationales (such as

ensuring witness comfort) that have no application to bail hearings in Philadelphia.

Thus, as the District Court rightly concluded, those cases do not address the question

at issue here: whether the public has a right to audio-record a hearing when it has no

other way to obtain a record of the proceeding.

**III.**    The magistrates assert that the recording ban is necessary to protect the

fair-trial rights of criminal defendants and to promote courtroom decorum. Yet, they

offer no evidence to support those justifications. Moreover, they never explain how a

restriction on documenting proceedings held in *open court* actually serves any legitimate

purpose. The press and the public are free to attend bail hearings and disseminate

whatever information they glean from those hearings. The recording ban does

nothing to shield that information from public disclosure; it simply inhibits the

public's ability to memorialize that information and to use it in public discourse. That

purpose—undermining the dissemination of information about open court

proceedings—cannot justify restrictions on the public's right of access.

The magistrates' stated justifications for the recording ban also contravene

existing case law. The Supreme Court has repeatedly held that generalized concerns

about trial fairness cannot justify *blanket* restrictions on the public's right of access to

pretrial proceedings. Rather, a trial court must identify specific, compelling reasons to

justify restricting public access to a proceeding in a given case. The magistrates have

not identified a single example of a Philadelphia bail hearing that would have been subject to closure under that standard. And they certainly have not identified any evidence to justify an across-the-board restriction on access in all cases.

**IV.**    This Court has stated on multiple occasions that restrictions on the ability to record government proceedings should be examined under the right-of-access framework—not the public-forum doctrine. The magistrates' suggestion to the contrary, therefore, cannot be squared with this Court's precedents. Regardless, even if the recording ban were analyzed under the public-forum doctrine, it still would not survive First Amendment scrutiny. To justify restrictions on expressive activity— even in a nonpublic forum—the government must provide evidence to justify the restriction. The magistrates have not done that here and the experience of other jurisdictions refutes their conclusory claims about the dangers of people having the right to access bail-hearing recordings: indeed, numerous courts around the country have made bail-hearing recordings available to the public without incident.

**V.**    Finally, the magistrates' attempt to characterize the District Court's ruling as sweeping in scope is unpersuasive. The Bail Fund challenged the recording ban only insofar as the ban prohibits it from audio-recording bail hearings in Philadelphia, and the District Court made clear that its ruling rested on the "narrow circumstances present here." JA 28. And, even if the District Court's ruling did have implications for other jurisdictions, the record contains no evidence to suggest that it would actually have the impact on those jurisdictions that the magistrates suggest.

## STANDARD OF REVIEW

This Court "review[s] the grant of summary judgment de novo." *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 215 (3d Cir. 2015).

## ARGUMENT

### I.    The challenged rules infringe the public's First Amendment right of access to bail hearings in Philadelphia.

The District Court held that when a court declines to make a verbatim record of proceedings available to the public, it cannot constitutionally prevent the public from making its own such record. That ruling is rooted in well-established First Amendment principles.

#### A.    The First Amendment protects the public's right to a comprehensive record of proceedings held in open court.

One of the "major purpose[s]" of the First Amendment is "to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). As the Supreme Court has recognized, those discussions play a particularly important role in our legal system by "subjecting the police, prosecutors, and judicial processes to extensive public scrutiny" and thereby "guard[ing] against the miscarriage of justice." *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966). Indeed, "it would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980).

For that reason, the Supreme Court has held that the First Amendment guarantees the public a right of access to criminal trials and other proceedings. *See generally Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-10 (1986) (describing the "First Amendment right of access to criminal proceedings"). That right protects several important "societal interests," including:

> promotion of the public perception of fairness which can be achieved only by permitting full public view of the proceedings; providing a significant community therapeutic value as an outlet for community concern, hostility and emotion; serving as a check on corrupt practices by exposing the judicial process to public scrutiny; enhancement of the performance of all involved; and discouragement of perjury.

*United States v. Simone*, 14 F.3d 833, 839 (3d Cir. 1994) (citation omitted). These interests create a strong presumption of openness that can be overcome only by a compelling, narrowly tailored justification for limiting the public's access to a specific proceeding. *See In re Avandia Marketing*, 924 F.3d 662, 673 (3d Cir. 2019).

As this Court has recognized, the right of access encompasses both access to the courtroom during a proceeding and the right to access documentation of what happens there. In *United States v. Antar*, for instance, the Court reversed an order sealing a transcript of *voir dire* proceedings, reasoning that the right of access "encompasses equally the live proceedings and the transcripts which document those proceedings." 38 F.3d 1348, 1359 (3d Cir. 1994). The Court explained that "[a]ccess to the documentation of an open proceeding . . . facilitates the openness of the proceeding itself by assuring the broadest dissemination." *Id.* at 1360. The Court

15

thus concluded: "It would be an odd result indeed were we to declare that our courtrooms must be open, but that transcripts of the proceedings occurring there may be closed, for what exists of the right of access if it extends only to those who can squeeze through the door?" *Id.*

Similarly, in *United States v. Martin*, this Court held that the public had a right of access to transcripts of audiotapes that had been played as evidence during a high-profile corruption trial. 746 F.2d 964, 968-69 (3d Cir. 1984). Although "representatives of the media were present at the trial and were able to take notes on the [audiotapes] as they were played to the jury," the Court noted that "this procedure has obvious limitations." *Id.* at 968. The Court concluded that the "public interest can best be vindicated by the release of complete and accurate transcriptions" of the audiotapes. *Id.* It therefore held that, despite the media's presence at trial, "the strong presumption in favor of public access applies to the[] transcripts." *Id.* at 968-69.

*Antar* and *Martin* thus make clear that the First Amendment protects not only the right to *attend* a proceeding in person but also the right to obtain a *comprehensive record* of what happened during that proceeding. Moreover, the cases establish that neither form of access is sufficient on its own. *See Antar*, 38 F.3d at 1360 n.13 ("We emphasize . . . that documentary access is not a substitute for concurrent access, and vice versa."); *Martin*, 746 F.2d at 968 (noting the "obvious limitations" of allowing the press to listen to an evidentiary recording but denying them subsequent access to a transcript of the recording). Rather, "[t]he right of access encompasses *both* forms,

and both are vitally important." *Antar*, 38 F.3d at 1360 n.13 (emphasis added). Indeed, as this Court has instructed, "[t]rue public access to a proceeding means access to knowledge of what occurred there." *Id.* at 1360.

Consistent with that principle, courts have held that the First Amendment protects at least some efforts by private citizens to document for themselves what happens in open court. Several cases recognize, for instance, that the public has the right to take notes during court proceedings. *See, e.g., Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 496 (1975) (holding that a television station had the right to broadcast information about a rape case derived from "notes taken during the court proceedings"); *Goldschmidt v. Coco*, 413 F. Supp. 2d 949, 952 (N.D. Ill. 2006) ("A sweeping prohibition of all note-taking by any outside party seems unlikely to withstand a challenge under the First Amendment."); *see also United States v. Cabra*, 622 F.2d 182, 184-85 (5th Cir. 1980) (holding that a district-court order barring note-taking during a criminal hearing was an abuse of discretion). And other cases recognize similar protections for courtroom sketching. *See, e.g., United States v. Columbia Broadcasting System*, 497 F.2d 102, 107 (5th Cir. 1974). These decisions recognize that the right of access cannot serve its underlying purpose—that is, facilitating the "free discussion of governmental affairs"—if the right does not protect the public's ability to memorialize open proceedings. *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982) (citation omitted).

This Court recognized the importance of that protection in *Whiteland Woods, L.P. v. Township of West Whiteland*, 193 F.3d 177 (3d Cir. 1999), which all parties here agree supplies the proper framework for deciding the present case. *See* Magistrates' Br. 30-31 (applying *Whiteland Woods*). In *Whiteland Woods*, a real-estate developer challenged a rule prohibiting it from videotaping a town planning-commission meeting. *Id.* at 178-79. Although this Court upheld the rule, its rationale for doing so confirms that the right of access protects the public's ability "to compile a full record of the proceedings." *Id.* at 184. Rather than holding that the public's right of access was limited to the right to attend the proceeding, this Court held that the videotaping ban passed First Amendment muster because the public had "alternative means of compiling a comprehensive record." *Id.* at 183. The Court cited, in particular, the fact that "[s]pectators were free to take notes, *use audio recording devices*, or even employ stenographic recording." *Id.* (emphasis added); *see also id.* at 180 (emphasizing that "other effective means of recording the proceedings [we]re available"). Thus, by focusing on the public's ability to "compil[e] a comprehensive record," *Whiteland Woods* made clear that the First Amendment protects more than just the "right to attend, observe, and report" on a proceeding, as the magistrates suggest (Br. 19).

## B.    The challenged rules prevent the public from compiling a comprehensive record of Philadelphia bail hearings.

Under *Whiteland Woods*, the "critical question" in determining whether a restriction on recording a proceeding violates the First Amendment is "whether the

restriction meaningfully interferes with the public's ability to inform itself of the proceeding: that is, whether it limits the underlying right of access rather than regulating the manner in which that access occurs." 193 F.3d at 183.

Here, the challenged rules directly impede the public's underlying right of access to bail proceedings in Philadelphia. Unlike the videotaping ban in *Whiteland Woods*, the rules here preclude the public from "compiling a comprehensive record" of the proceedings, 193 F.3d at 183, and expressly prohibit making any stenographic or audio recordings. *Compare* Pa. R. Crim. P. 112(C) ("[T]he stenographic, mechanical, electronic recording, or the recording using any advanced communication technology, of any judicial proceedings by anyone other than the official court stenographer in a court case, for any purpose, is prohibited."), *with Whiteland Woods*, 193 F.3d at 179 ("audio recording or stenographic recording equipment may be used"). And, because Philadelphia's bail hearings occur entirely off the record, the public has no opportunity to obtain an official transcript or recording of the proceedings after the fact. JA 61.

Moreover, the record in this case demonstrates that the nature and format of the hearings prevent those in attendance from creating a verbatim record of the proceedings through handwritten notes alone. JA 123. As the Bail Fund's director explained in his declaration, the "volume of information and speed of arguments exchanged during each hearing, and the quick, back-to-back nature of the hearings, makes it impossible to document by hand everything that occurs (let alone to do so

19

verbatim)." JA 123; *see also* JA 60-61 (describing the rapid, jargon-heavy nature of the hearings). In other words, just as in *Martin*, the Bail Fund's ability to take notes of the proceedings "has obvious limitations." 746 F.2d at 968. The magistrates have not offered any evidence to refute these facts, which are based on the Bail Fund's extensive court-watching experience and which the District Court properly accepted. *See* JA 29 (finding that "attendance and notes alone are insufficient to comprehend the full import of these numerous and rapid hearings").[3]

The fact that the bail hearings are open to the public does not cure the First Amendment problem. As this Court has made clear, the right of access cannot be satisfied merely by giving the public an opportunity to observe the proceeding in person; rather, the public must also have a meaningful opportunity to obtain or create a comprehensive record of the proceeding. *See, e.g.*, *Antar*, 38 F.3d at 1360 n.13 ("We emphasize . . . that documentary access is not a substitute for concurrent access, and

---

[3] The Bail Fund's experience also comports with recent academic literature in the field of linguistics. A peer-reviewed study from 2019, for example, found a high rate of transcription errors among Philadelphia's *professional* court reporters in seeking to transcribe the words of African-American speakers—even when the reporters had access to technological transcription aids not available to bail-hearing attendees. *See* Taylor Jones, Jessica Rose Kalbfeld, Ryan Hancock, & Robin Clark, *Testifying While Black: An Experimental Study of Court Reporter Accuracy in Transcription of African American English*, 95 Language e216, e216 (June 2019), https://perma.cc/822V-AYYU (finding that "Philadelphia court reporters consistently fail to meet th[e] level of transcription accuracy" required for professional certification when transcribing the testimony of African-American speakers).

vice versa."). The evidentiary record here plainly demonstrates that in-person access to Philadelphia's bail hearings does not provide the public with such an opportunity.

The public's inability to document exactly what is said during the bail hearings distinguishes the recording ban at issue here from the one upheld in *Whiteland Woods*, where "[n]othing in the record suggest[ed] videotaping would have provided a uniquely valuable source of information about Planning Commission meetings." 193 F.3d at 183; *see also id.* at 180 (highlighting "other effective means of recording the proceedings" available to the public). Unlike in *Whiteland Woods*, the record here makes clear that the ability to make audio recordings of the bail hearings would provide both the Bail Fund and the public with "a uniquely valuable source of information" about the hearings. Indeed, the Municipal Court itself relies on recordings of the proceedings to monitor the performance of the bail magistrates. JA 116. And, if the Bail Fund were permitted to create and share its own recordings, those recordings would constitute the *only* publicly available, verbatim account of a defendant's initial appearance in court.

The other important distinction between this case and *Whiteland Woods* is in the public significance of the proceedings at issue. Unlike the meetings of a town planning commission, bail hearings establish the terms and conditions under which the government may deprive its citizens of their freedom. Bail proceedings thus constitute "a significant part of the criminal process" and, as the District Court rightly noted, have a "constitutional dimension to them." JA 25-26 (noting that both the

U.S. and Pennsylvania Constitutions refer explicitly to "[e]xcessive bail"). For precisely those reasons, the public's interest in memorializing what happens during those hearings—which affect thousands of Philadelphians every year—is considerably greater than the public's interest in recording a town's planning-commission meeting. *See, e.g.*, JA 122-23 (describing recent media coverage of Philadelphia's bail process).

Since its decision in *Whiteland Woods*, this Court has reaffirmed that the First Amendment protects the public's ability to record certain government activities. In *Fields v. City of Philadelphia*, 862 F.3d 353 (3d Cir. 2017), this Court considered whether the public has a First Amendment right to record police officers conducting their official duties in public view. The Court held that "recording police activity in public falls squarely within the First Amendment right of access to information." *Id.* at 359. That decision underscores the constitutional significance of citizen efforts to document the government's public activities; indeed, the Court in *Fields* expressly recognized that the right to record is "particularly important because it leads to citizen discourse on public issues, 'the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.'" *Id.* (quoting *Snyder v. Phelps*, 562 U.S. 443, 452 (2011)).

While this same right should protect the Bail Fund's ability to record prosecutors and magistrates performing their duties in a public courtroom, this Court need not decide whether (or to what extent) *Fields*'s specific protections apply here. As explained, *Whiteland Woods* provides ample guidance for resolving this case.

22

Nevertheless, *Fields* remains instructive in other ways.  In particular, the decision highlights the unique role that recordings of public officials play in fostering public discourse.  The Court's opinion emphasized the objective nature of such recordings, noting that information about government serves as "the wellspring of our debates" and "the more credible the information the more credible are the debates."  862 F.3d at 359; *see also id.* ("To record what there is the right for the eye to see or the ear to hear corroborates or lays aside subjective impressions for objective facts."); *id.* at 360 ("In addition to complementing the role of the traditional press, private recordings have improved professional reporting[.]").  And the Court also noted that "[r]ecordings . . . facilitate discussion because of the ease in which they can be widely distributed via different forms of media."  *Id.* at 359.  Thus, by highlighting the specific benefits of recording government conduct that would otherwise go undocumented, *Fields* illustrates how the rules at issue here deprive the public of "a uniquely valuable source of information" about bail hearings.  *Whiteland Woods*, 193 F.3d at 183.

### C.    None of the publicly available sources that the bail magistrates have identified provides a viable substitute for an actual record of the proceedings.

The bail magistrates contend that the ban on audio-recording does not infringe the public's right of access because "additional means exist to obtain information about bail at arraignments."  Magistrates' Br. 32.  Notably, however, the Municipal Court itself considers those "additional means" inadequate: once again, the court

relies on audio recordings of bail hearings to monitor the magistrates' job performance.  JA 117.  That practice is hardly surprising, given the shortcomings of the various court records the magistrates have identified.

The magistrates point, for instance, to the availability of certain "bail documents" filed after each arraignment, online docket sheets, and "data compilations" maintained by the Administrative Office of Pennsylvania Courts (AOPC).  Magistrates' Br. 32-33.  But none of those sources provides a record of what is actually said during a bail hearing.  As a result, all of the sources omit critical information about the bail process—including the parties' arguments and, most importantly, whatever *reasons* a magistrate might provide for his or her decision.

Unlike other judges, bail magistrates do not issue written opinions or otherwise set forth the reasons for their decisions in writing.  Thus, no existing court records document the magistrate's rationale for deciding "whether to release a defendant, and what conditions, if any, to impose."  Pa. R. Crim. P. 523(a).  Furthermore, because all bail hearings in Philadelphia occur entirely off the record, no records exist to document whatever reasons a magistrate might provide (orally) at the hearing itself.  The public's lack of access to any transcripts or recordings of the hearings makes it difficult even to speculate about what factors might have motivated the magistrate's decision in any given case: after all, the magistrate's questions for the parties—and the parties' responses to those questions—are never memorialized in any form.  JA 61.

24

Existing court records also fail to capture other critical elements of the bail-setting process. No effort is made, for instance, to document the arguments raised by the prosecutor, the arguments raised by the defense, or the specific topics discussed; in fact, the court does not even document who spoke at a hearing, let alone what they actually said. The dearth of information concerning the parties' statements during the hearings has a concrete impact on civic discourse. As the Bail Fund's director recounted in his declaration, local officials have sometimes disputed the Bail Fund's characterizations of how prosecutors and public defenders conduct themselves during bail hearings. *See* JA 123 (noting that "some officials have disputed the Bail Fund's characterization of the amounts and stated rationales for prosecutors' requests for cash bail as well as questioned the frequency with which the Defender Association's representatives advocated for their clients during preliminary arraignments"). Existing court records cannot resolve those disputes because they say nothing about what is discussed during the hearings.

The "data compilations" that the magistrates reference (Br. 33-34) are similarly deficient—as well as costly. A single request for such data can take eight weeks to process and costs $80 for every hour of staff time it requires. *See* JA 64, 97. Recurring requests cost a minimum of $240 per month. JA 99. And, even setting aside the financial costs, the AOPC requires every requester to "ensure that the information provided will be *secure and protected*." JA 92 (emphasis added); *see also id.* (mandating that requesters identify "the purpose/reason for the request" and

"certif[y] that the information will not be used except for the stated purposes"). That requirement, on its face, limits the requester's ability to use the records to engage in public discourse about the bail system.

Besides the obstacles in obtaining these records, the records themselves are often difficult to decipher. The public docket sheets, for instance, are formatted in a way that obscures key information about the bail hearing. To take just one example: the docket entry for an arrestee's preliminary arraignment (listed under the "Calendar Events" heading) typically contains a blank space in the field reserved for "Judge Name"—the field that is supposed to identify the magistrate who presided over the arraignment. *See, e.g.*, JA 86 (Sample Docket Sheet). The magistrate's name appears only at the very end of the docket sheet—under the "Entries" heading, on the final page—and nothing on the docket sheet actually identifies him or her as the magistrate who presided over the arraignment. *See* JA 87. Thus, unless a reader is already familiar with the names of all of the current bail magistrates, he or she cannot glean from the docket sheet who presided over the preliminary arraignment. And, even if a reader is able to identify the presiding magistrate, the docket sheet remains devoid of any explanation of the basis for the magistrate's decision.

26

## II.    The case law cited by the magistrates is inapposite.

### A.    The magistrates' cited cases involved different types of proceedings and different methods of recording.

The magistrates cite numerous cases for the broad proposition that "[c]ourts have consistently held that the press and public have no right to record or broadcast court proceedings." Magistrates' Br. 22. The Bail Fund does not dispute that those cases rejected various claims asserting a constitutional right to record court proceedings. But none of the cases involved the type of highly unusual proceeding at issue in this case—namely, one that occurs entirely off the record.

That distinction is crucial. As the Supreme Court has explained, the right-of-access inquiry typically examines "whether public access plays a significant positive role in the functioning of the *particular process in question*." *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986) (emphasis added). The public's ability (or inability) to obtain a verbatim record of the proceeding is plainly relevant to that analysis. *See Whiteland Woods*, 193 F.3d at 183 (considering whether the public had "alternative means of compiling a comprehensive record").

The magistrates rely on selective quotes from two Supreme Court decisions (Br. 22-23), but those decisions only highlight the gap between the decided cases and the present situation. For instance, the magistrates rely on the Court's statement in *Nixon v. Warner Communications, Inc.*, 435 U.S. 589 (1978), that "there is no constitutional right to have [live witness] *testimony* recorded and broadcast." *Id.* at 610

(emphasis added). That language—on its face—has no application to the proceedings at issue here, which do not involve any witness testimony. And, more to the point, *Nixon* did not involve a dispute over the public's right of access to a verbatim record of any proceeding. Rather, in *Nixon*, members of the press sought to obtain copies of audiotapes, which had been played as evidence during a criminal trial, *after* they had already obtained a "verbatim written transcript" of the tapes. *Id.* at 601. Thus, their right to access a comprehensive record of the proceedings was never at issue. *Cf. Martin*, 746 F.2d at 968-69 (holding that the press had a right of access to written transcripts of audiotapes played as evidence during a criminal trial).[4]

The magistrates' reliance on *Chandler v. Florida*, 449 U.S. 560 (1981), is even less helpful to them here. *Chandler* did not purport to opine on the First Amendment at all; rather, the case rejected a *Sixth* Amendment challenge to a Florida rule *permitting* television coverage of criminal proceedings. *See id.* at 562. The language that the magistrates cite from the case (Br. 23)—which constitutes *Chandler*'s sole reference to the First Amendment—appears in a quote from an earlier *Florida Supreme Court* decision in a *different* case. *See* 449 U.S. at 569 (quoting *In re Petition of Post-Newsweek Stations*, 370 So.2d 764, 774 (Fla. 1979)). And, even in quoting that case, the Supreme Court never actually endorsed the Florida court's

---

[4] In addition, because the trial in *Nixon* took place in federal court, all of the proceedings occurred on the record. *See* 28 U.S.C § 753(b) (providing that all proceedings before a federal district judge "shall be recorded verbatim").

reasoning—it merely referenced the case in recounting Florida's prior experience with courtroom broadcasting. To the extent *Chandler* has any relevance here at all, then, it is in showing that a blanket ban on court recording is not necessary to safeguard the fair-trial rights of criminal defendants. *See, e.g., id.* at 578-79 ("[A]t present no one has been able to present empirical data sufficient to establish that the mere presence of the broadcast media inherently has an adverse effect on that process.").

In addition to focusing on other types of proceedings, the cases cited by the magistrates also involved other types of recording—such as video and photography—which raise different considerations from audio-recording.[5] Video and photography, for example, both require a camera to be pointed directly at the participants in a proceeding, unlike audio-recording. One of the magistrates' own cited cases illustrates that audio-recording does not implicate the same concerns as other recording formats. *See United States v. Kerley*, 753 F.2d 617, 621-22 (7th Cir.

---

[5] *See, e.g., Conway v. United States*, 852 F.2d 187, 188 (6th Cir. 1988) (rejecting claim that journalists had a First Amendment right "to telecast, broadcast and photograph [a] trial"); *United States v. Hastings*, 695 F.2d 1278, 1280 (11th Cir. 1983) (rejecting claim that television stations had a First Amendment right "to televise, photograph, record, and broadcast federal criminal trials"); *Tribune Review Publishing Co. v. Thomas*, 254 F.2d 883, 884 (3d Cir. 1958) (rejecting claim that newspapers had a First Amendment right to take photographs inside state courthouses). This Court's decision in *Tribune Review*—which predated all of the Supreme Court's major right-of-access decisions—is especially inapposite here. Besides its focus on photography, the case never analyzed the right to document government proceedings because the plaintiffs never asserted a right to photograph court proceedings. *See* 254 F.2d at 884 (noting that the plaintiffs disclaimed any right to photograph inside a courtroom).

1985) (rejecting a defendant's request to videotape his own criminal case while noting that "the trial court will permit [the defendant] to record the proceedings on audiotape"); *see also Whiteland Woods*, 193 F.3d at 183 ("Nothing in the record suggests *videotaping* would have provided a uniquely valuable source of information about Planning Commission meetings." (emphasis added)).

The magistrates cite just one case that deals exclusively with audio-recording and that case does little to advance their cause. That case, *United States v. Yonkers Board of Education*, 747 F.2d 111 (2d Cir. 1984), involved a newspaper reporter who challenged a local rule barring him from bringing a tape-recorder into court. *Id.* at 112. The Second Circuit upheld the recording ban as a reasonable "time, place, and manner" restriction. *Id.* at 114. In explaining why the ban was reasonable, the court cited two substantive justifications for the prohibition (as well as an unspecified concern about decorum). The first was "the likelihood that witnesses would be inhibited by the mere knowledge that their words were being recorded by outside observers." *Id.* And the second was "the possibility . . . that allowing indiscriminate recording of trial proceedings might undermine the official court reporter system." *Id.* Neither of those justifications, however, has any relevance to the proceedings at issue here.[6] When it comes to Philadelphia bail hearings, there

---

[6] There are also good reasons to question the validity of the *Yonkers* court's stated concerns. Its concern about the potential for witness inhibition, for instance, runs directly counter to the traditional view—endorsed by this Court—that the

*Continued on next page.*

are no witnesses to inhibit and no official court-reporting system to undermine.

*Yonkers* thus crystallizes the central problem with the magistrates' cited cases: all of their cases invoke rationales that have little, if any, resonance in the context of the proceedings at issue here.

### B. The magistrates' reliance on cases addressing courtroom closures only reaffirms that their stated justifications for the audio-recording ban are inadequate.

The magistrates cite just one case addressing the public's right of access in the bail-hearing context: *In re Globe Newspaper Company*, 729 F.2d 47 (1st Cir. 1984). That case, however, did not involve any restrictions on the public's ability to *record* bail proceedings; rather, it involved a restriction on the public's ability to *attend* a bail hearing. The question in *In re Globe*, in other words, was not whether the court could prevent people from documenting a public court proceeding but, instead, whether the proceeding in that case needed to be public at all.

*In re Globe* arose from a district court's decision to close the courtroom during bail proceedings in a major organized-crime prosecution. 729 F.2d at 50. A newspaper filed a mandamus petition with the First Circuit, arguing that the

---

openness of a trial proceeding *benefits* the fact-finding process. *See, e.g.*, *United States v. A.D.*, 28 F.3d 1353, 1357 (3d Cir. 1994) (noting that public access to judicial proceedings "enhances the performance of all involved" and "discourages perjury"). And its concern that "indiscriminate recording . . . might undermine the official court reporter system" is speculative (the court cited no evidence for the concern), idiosyncratic (no other courts appear to share the concern), and illogical (the more recordings of a proceeding that exist, the easier it is to *verify* the accuracy of the official court record).

courtroom closure violated the First Amendment. *Id.* The First Circuit rejected the newspaper's petition. *Id.* at 59. It held that, although "the First Amendment right of access *does* extend to bail hearings," *id.* at 53 (emphasis added), the decision to close the courtroom was justified in that particular case because of the likelihood that the proceeding would reveal sensitive evidentiary information (specifically, materials obtained via a potentially unlawful wiretap), *see id.* at 56-59.

The court's reasoning in *In re Globe*—which focuses on the need to *prevent the disclosure* of sensitive information in the first instance—has no application to a ban on recording information that has *already been disclosed* in a public proceeding. Indeed, once information has been disclosed in open court, a court cannot punish the public or the press from disseminating it. *See, e.g.*, *Craig v. Harney*, 331 U.S. 367, 374 (1947) ("What transpires in the court room is public property. . . . Those who see and hear what transpired can report it with impunity."). Here, the magistrates openly acknowledge that the recording ban does nothing to prevent the *disclosure* of any sensitive information to the press or the public. *See* Magistrates' Br. 20 (stating that the public can "take notes and report on every arraignment"). Instead, they argue that the ban is designed to hinder the public's ability to *disseminate* information about the hearings. *See id.* at 46-52 (arguing that recordings could jeopardize fair-trial rights if widely shared). Nothing in *In re Globe* suggests that a court may restrict the public's ability to share information about a bail hearing that was held in open court. And

certainly nothing in the case suggests that a court may restrict the public's ability to share information about *all* bail hearings held in open court.

The magistrates' reliance on *Gannett Co. v. DePasquale*, 443 U.S. 368 (1979), is misplaced for the same reason.  In *Gannett*, the Supreme Court upheld a trial-court order closing the courtroom for a pretrial suppression hearing.  *Id.* at 394.  There, too, however, the Court's decision turned on the need to prevent the initial *disclosure*—not the subsequent *dissemination*—of sensitive information in that particular case.  *Gannett* never suggests that a court's concern for a defendant's fair-trial rights would justify imposing restrictions (much less a blanket restriction) on the public's ability to disseminate information that had *previously* been disclosed in open court.  In fact, case law suggests just the opposite.  *See Cox Broad.*, 420 U.S. at 496; *Craig*, 331 U.S. at 374 ("If a transcript of the court proceedings had been published, we suppose none would claim that the judge could punish the publisher for contempt.").

## III.   The blanket ban on audio-recording bail hearings is not necessary to protect the rights of criminal defendants or to promote decorum.

The bail magistrates do not argue that letting the public audio-record bail hearings would actually disrupt the proceedings in any way.  *See* Magistrates' Br. 51 ("That [audio] recordings can be made in 'less disruptive' ways is irrelevant.").  Nor do they argue that the information exchanged during the hearings is so sensitive that the public should be barred from the hearings altogether.  Instead, the magistrates claim that the recording ban is necessary to *inhibit* (but not eliminate) the public's ability to

disseminate the details of what happens during bail hearings. Specifically, they assert that the dissemination of that information could jeopardize the rights of criminal defendants and undermine courtroom decorum. As explained below, those assertions are not supported by the record and cannot justify the ban on audio-recording in this context.

### A.    The magistrates' conclusory assertions about the need to protect criminal defendants' rights cannot justify the ban on audio-recording bail hearings.

The magistrates contend that the recording ban "mitigate[s] potential prejudice to defendants and to the court system." Magistrates' Br. 40. In particular, they claim that the ban prevents "adverse publicity" and thereby safeguards "a defendant's ability to receive a fair trial." *Id.* at 41-43 (citation and quotation marks omitted). That claim, however, cannot justify a blanket restriction on the public's right of access—particularly when the record contains no evidence to support it. *See Press-Enterprise Co.*, 478 U.S. at 15 ("The First Amendment right of access cannot be overcome by the conclusory assertion that publicity might deprive the defendant of th[e] right [to a fair trial].").

As an initial matter, nothing in the record suggests that the dissemination of information about *bail hearings* poses a unique threat to trial fairness. Although the magistrates point to the general dangers of pretrial publicity, they never offer any evidence to suggest that media coverage of bail hearings, in particular, poses a real risk to trial fairness. And the record provides several reasons to doubt that such a risk

34

exists in this case.  The hearings at issue are very brief—typically no more than a few minutes, JA 61—and do not involve any presentations of evidence or witnesses, minimizing the chances of any substantive disclosures.  Moreover, in Philadelphia, the defendants are represented by counsel, JA 59, further minimizing the risk of prejudicial disclosures.[7]  Given these factors, it is not surprising that the magistrates have failed to identify a single case that was influenced by media coverage of a bail hearing—a telling omission in a City with 30,000 bail hearings each year, all of which are open to the press.  JA 61-62.

The magistrates have also failed to offer any evidence that *audio-recording* bail hearings—as opposed to other, permitted forms of documenting the proceedings— poses a unique threat to fair-trial rights.  Again, members of the public and the press are allowed to attend bail hearings, take notes, and freely publish (or broadcast) any information they glean.  JA 61.  Thus, the audio-recording ban does not actually *prevent* anyone from disseminating information about bail hearings; it simply makes it *harder* for them to do so by depriving them of a comprehensive, verbatim record of the proceedings.  *See* JA 123.  It is not clear why the risk of pretrial publicity is serious

---

[7]  A defendant who takes an immediate appeal of the magistrate's initial bail decision is not even present for the appeal, thereby eliminating any risk of inadvertent disclosures by the defendant during that part of the proceeding.  *See* JA 61 ("The arrestee's audio-visual connection is terminated before the appeal.").

enough to justify a ban on recording bail hearings but not serious enough to restrict public access to (or reporting on) the proceedings.[8]

While the magistrates suggest that there is something uniquely prejudicial about disseminating a defendant's "own words" (Br. 47), they never attempt to explain why using an audio-recorder to capture those words is more prejudicial than using a notepad. Nor do they attempt to reconcile their argument with *Nebraska Press Association v. Stuart*, 427 U.S. 539 (1976), which invalidated a trial-court order barring the press from "broadcasting accounts of confessions or admission made by the accused." *Id.* at 541. And they never acknowledge that a recording of the defendant's words could just as easily *protect* a defendant against the prejudice that would result from his or her words being mischaracterized or taken out of context. *Cf. Fields*, 862 F.3d at 360 (noting that "bystander recordings [of police] can 'exonerate an officer charged with wrongdoing'" (citation omitted)).

The practices of other jurisdictions cast further doubt on the magistrates' stated concerns. Dozens of trial courts around the country—at both the state and federal level—allow members of the press and the public to obtain recordings of bail

---

[8] As noted above, the only case the magistrates have cited involving restrictions on public access in the bail-hearing context involved a restriction on access to the *courtroom*—not a restriction on documenting or disseminating information. *See In re Globe*, 729 F.2d at 59.

hearings.[9]  *See, e.g.*, *Public Access to Court Electronic Records, Digital Audio Recording Project* (last accessed Jan. 2, 2020), https://perma.cc/7L2J-K2YW  (providing a non-exhaustive list of federal district courts that make audio recordings of all court proceedings available to the public); JA 28 n.9 (noting the availability of such recordings in the Eastern District of Pennsylvania).  And trial courts in several other jurisdictions generally permit members of the public to make their own recordings.  *See, e.g.*, Fla. R. Jud. Admin. 2.450(a); N.C. R. Super. & Dist. Cts. 15(b); N.M. Sup. Ct. R. 23-107; Ohio R. of Superintendence for Cts. 12(A); Tenn. Sup. Ct. R. 30(A)(1).  The bail magistrates have not identified a single incident from any of those

---

[9]  For example, members of the public may obtain recordings of any state-court bail hearing (for which a recording exists) in Alaska, Connecticut, Maine, Massachusetts, Maryland, Nebraska, New Hampshire, New Jersey, North Dakota, Rhode Island, Utah, and Vermont.  *See* Alaska Admin. R. 9(d), 37.5(b); Conn., *Purchasing Audio Recordings of Judicial Branch Proceedings* (Oct. 23, 2018), https://perma.cc/5ZG2-KS87; Me., *Transcript & Audio Order Form*, https://perma.cc/2W4X-9CEV (last visited May 28, 2020); Mass., *Order the Audio of a Superior Court Proceeding*, https://perma.cc/5BMS-B68F (last visited May 28, 2020); Md. R. 16-502(g); Neb. S. Ct. R. 6-1405; N.H. R. Crim. P. 53(a); N.J. Courts, *Digital Sound Recording in the Courtroom* (Oct. 2019), https://perma.cc/JT8U-LGK5; N.D. Sup. Ct. Admin. R. 39 & 40; R.I. Judiciary, *Request for Copy of District Court Proceedings*, https://perma.cc/2BTZ-NFMG (last visited May 28, 2020); Utah Code Jud. Admin. R. 4-202.03, 4-202.08; Vt. R. Crim. P. 53.1(f).  And many major cities in other states likewise allow the public either to access official recordings of such proceedings.  *See, e.g.*, Los Angeles, Cal.: *For the Record: Superior Court of California: County of Los Angeles*, https://perma.cc/26QU-YC9V (last visited May 28, 2020); Phoenix, Ariz.: *Maricopa County, E-Courtrooms*, https://perma.cc/77V6-NAWR (last visited May 28, 2020); Seattle, Wash.: *King County, Request for a Copy of a Video (VHS) or Audio (Cassette) Tape*, https://perma.cc/4ZRB-EBXW (last visited May 28, 2020); Louisville, Ky.: *Jefferson County, Audio/Video Department*, https://perma.cc/2RAC-SFH3 (last visited May 28, 2020).

jurisdictions—much less a pattern of incidents—in which the release of a bail-hearing

recording undermined the trial process.[10]

Notably, all of the magistrates' stated concerns can be addressed adequately

through the ordinary judicial tools for ensuring fair trials.  This Court has repeatedly

stated that "the appropriate course to follow when the spectre of prejudicial publicity

is raised is not automatically to deny access but to rely primarily on the curative device

of *voir dire* examination."  *Martin*, 746 F.2d at 973 (quoting *United States v. Criden*, 648

F.2d 814, 827 (3d Cir. 1981)); *see also Nebraska Press Ass'n*, 427 U.S. at 563 (listing

various safeguards against prejudicial trial publicity, including, *inter alia*, "change of

trial venue" and "the use of emphatic and clear [jury] instructions").  Tools like *voir*

*dire* are just one reason why pretrial publicity (which is unlikely to result *solely* because a

bail-hearing recording exists) rarely results in juror prejudice—particularly in major

cities, like Philadelphia, which have "large, diverse pool[s] of potential jurors."  *Skilling*

*v. United States*, 561 U.S. 358, 382 (2010).

The magistrates' fair-trial concerns also ring hollow in light of the court

system's own willingness to make public much of the information that the magistrates

have characterized as prejudicial.  For example, the magistrates claim that the

recording ban safeguards against the dissemination of information about a defendant's

---

[10]  In contrast, those jurisdictions do offer examples of how public access to
bail-hearing recordings enhances public discourse and reporting on the bail process.
*See, e.g.*, Lise Olsen, *Videotapes Reveal Flaws in Harris County Bail Bond Hearings*, Hous.
Chron. (Nov. 30, 2016), https://perma.cc/ERU3-L4EQ.

"criminal history" or "charges," which may be discussed during bail hearings.  *See* Magistrates' Br. 42.  But AOPC itself makes that information available online, via its own web portal.  *See* JA 63 (describing web portal); JA 87 (displaying defendant's charges on docket).[11]  Nowhere do the magistrates explain why a defendant would be prejudiced if the public obtained this information via a bail-hearing recording but not if the public obtained it from the AOPC's own website.

In any event, even if the record here evinced a real threat to defendants' rights (which it does not), the magistrates' concerns still would not justify an across-the-board ban on audio-recording bail hearings in all cases.  The Supreme Court has stressed that blanket restrictions on the right of access cannot be based on speculative concerns about defendants' fair-trial rights.  *See, e.g.*, *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 151 (1993) ("The concern of the majority below that publicity will prejudice defendants' fair trial rights is, of course, legitimate.  But this concern can

---

[11]  The arrestee's criminal history, including both past and pending charges, can be found in a document entitled "Court Summary," which is posted online alongside every criminal docket sheet.  A sample court summary—taken from the same case as the sample docket sheet attached to the parties' Stipulation—was attached to the Bail Fund's summary-judgment opposition.  *See* Dist. Ct. ECF No. 45, at 24 (listing the arrestee's criminal history under the "Closed" heading).  Although Pennsylvania's 2018 "Clean Slate" Law allows certain portions of people's criminal histories to be expunged, the public can still access other criminal-history information through AOPC's web portal, as the attached court summary demonstrates.  Furthermore, even if AOPC no longer posts arrestees' *full* criminal histories online, its prior practice of doing so still undercuts its claims about the need to shield such information from public dissemination.  And, in any event, Pennsylvania's legislative decision on how to handle certain criminal records cannot override the public's First Amendment rights, especially as to information disclosed in open court.

and must be addressed on a case-by-case basis."); *Chandler*, 449 U.S. at 574-75 ("An absolute constitutional ban on broadcast coverage of trials cannot be justified simply because there is a danger that, in some cases, prejudicial broadcast accounts of pretrial and trial events may impair the ability of jurors to decide the issue of guilt or innocence uninfluenced by extraneous matter.").

And the Court has likewise made clear that fair-trial concerns will rarely, if ever, justify restrictions on the dissemination of information that was disclosed in open court. *See, e.g.*, *Oklahoma Publishing Co. v. District Court*, 430 U.S. 308, 311-12 (1977) (per curiam) (invalidating a pretrial order that barred the press from publishing or broadcasting the name of a juvenile defendant whose identity was disclosed during a pretrial detention hearing); *Nebraska Press Ass'n*, 427 U.S. at 541, 569-70 (invalidating pretrial order that barred publishing or broadcasting inculpatory evidence disclosed in open court and explaining it would be "difficult" to "show[] the kind of threat to fair trial rights that would possess the requisite degree of certainty to justify [such a] restraint").

The Court's decisions in these cases are hardly surprising. After all, the notion that public scrutiny of the judicial process would undermine—rather than enhance— the fairness of criminal proceedings inverts the very interests underlying the constitutional mandate that such proceedings be open to the public. *See, e.g.*, *United States v. A.D.*, 28 F.3d 1353, 1357 (3d Cir. 1994) (noting that "public access to criminal proceedings gives the assurance that the proceedings were conducted fairly" and

"serves as a check on corrupt practices by exposing the judicial process to public scrutiny, thus discouraging decisions based on secret bias or partiality" (citation omitted)); *see also* U.S. Const. amend. VI (guaranteeing criminal defendants the "right to a . . . *public* trial" (emphasis added)).[12]

### B. The magistrates' assertion that the audio-recording ban promotes decorum is likewise unsupported and inadequate.

The magistrates claim that the recording ban "preserve[s] courtroom decorum." Magistrates' Br. 50; *see also, e.g.*, *id.* at 18 (asserting that the ban "ensure[s] the decorum of court proceedings"). But they never explain how the use of "silent, handheld recording devices," JA 67, during bail hearings would actually threaten courtroom decorum. More to the point, they have not cited any evidence to suggest that allowing the public to audio-record bail hearings would have any discernible impact on the proceedings themselves. If anything, the record suggests that the opposite is true.

First, the record demonstrates that the mere presence of a recording device inside the courtroom does nothing to undermine decorum. The Municipal Court has been recording bail hearings for over a year, JA 116, and the magistrates have

---

[12]  None of this is to say, of course, that members of the public must be permitted to audio-record all bail proceedings in Philadelphia. Judges remain free to close those proceedings, on a case-by-case basis, when closure is necessitated by compelling reasons. *See Globe Newspaper Co.*, 457 U.S. at 606 (noting that "the State's justification in denying access must be a weighty one").

never suggested—nor offered evidence to suggest—that the practice has any impact on courtroom decorum.

Second, the record provides no basis to conclude that people who observe bail hearings would behave in a disruptive manner if they gained the ability to audio-record the proceedings. Under existing Municipal Court rules, members of the public are subject to a variety of rules governing their in-court conduct, including restrictions on their use of electronic devices. JA 62. Virtually all of those restrictions would remain unchanged if the recording ban were lifted and magistrates would retain the same authority they currently have to remove disruptive spectators. There is no reason to believe that the ban on audio-recording plays a meaningful role in preventing disruptions or otherwise preserving courtroom decorum.

Nor is there any reason to believe that removing the recording ban would impose any new "burden[s] on judicial officers and court staff . . . to monitor who in the gallery may be simply audio recording as opposed to video recording or taking pictures." Magistrates' Br. 50. Court staff and magistrates are already obligated to prevent video-recording and photography inside the courtroom under existing court rules and would remain subject to that obligation regardless of whether the ban on audio-recording is lifted. And, even if lifting the audio-recording ban did impose new obligations on court staff, that minimal burden would not justify restricting the public's First Amendment right of access.

Finally, to the extent that the magistrates' decorum argument rests on their concern that bail-hearing participants might alter their behavior if the audio-recording ban is lifted, that concern is also unfounded. Numerous courts— including both the Supreme Court and this Court—not only make audio recordings of all of their proceedings, they then post those recordings online. And many other courts—including the Eastern District of Pennsylvania, JA 28—provide audio recordings of their proceedings available to the public upon request. *See supra* footnote 9 (listing jurisdictions). It is doubtful that these courts would maintain those practices if they had a detrimental impact on the litigants' conduct.

Moreover, the magistrates and the attorneys who participate in the bail hearings are already aware that the hearings are taking place in open court (and being recorded by Municipal Court officials). And the arrestees—who participate in the hearings via a video link—likely have no way of knowing whether they are being recorded or not under the current system. In other words, the knowledge that the proceedings are being recorded is unlikely to alter the behavior of the participants in any substantive way, let alone for the worse. *See A.D.*, 28 F.3d at 1357 (noting that "public access to criminal proceedings *enhances* the performance of all involved" (emphasis added; citation omitted)).

## IV. The magistrates' reliance on the public-forum doctrine is misplaced.

After initially urging this Court to apply *Whiteland Woods* (Br. 30-31), the magistrates suggest that this Court could also reverse the District Court's ruling under

the public-forum doctrine (Br. 43).  That argument fails for two reasons.  First, the public-forum doctrine does not apply to restrictions on the kind of First Amendment activity at issue here—specifically, the right to document government proceedings. Second, even if the public-forum doctrine did apply here, the Bail Fund would still prevail under that doctrine in light of the magistrates' failure to show that the recording ban is reasonable in the bail-hearing context.

### A.    The public-forum doctrine is inapplicable here.

This Court has made clear that restrictions on the First Amendment right of access to government proceedings should not be resolved under the public-forum doctrine.  *Whiteland Woods* makes this point explicitly.  There, the Court noted that other (out-of-circuit) cases had occasionally applied the public-forum doctrine to restrictions on the public's ability to record government proceedings, but it ultimately held that such an approach was improper.  *See* 193 F.3d at 182-83 ("We are not convinced that forum analysis is necessary to resolve such restrictions on the right of access.").  And the Court continued to adhere to that approach in subsequent cases. *See PG Pub. Co. v. Aichele*, 705 F.3d 91, 99-100 (3d Cir. 2013) ("[O]ur focus is on access to information.  Thus, we do not believe that the traditional forum analysis is apposite here.").

This Court's refusal to apply a public-forum analysis to restrictions on the public's ability to record government proceedings makes good sense.  Courts typically use the public-forum doctrine to analyze restrictions on expressive activities that

threaten to disrupt the use of government or public property *in real time*—such as protests, parades, or picket lines. *See, e.g., Int'l Soc. for Krishna Consciousness, Inc. v. New Jersey Sports & Exposition Auth.*, 691 F.2d 155, 161 (3d Cir. 1982) ("Generally, the need to maintain public order justifies greater restrictions on *active* conduct such as picketing than on speech." (emphasis added)). But the doctrine is ill-suited to analyze restrictions on other types of First Amendment activities—such as documenting government proceedings—aimed at creating speech for *subsequent* expression.

The cases cited in the magistrates' brief only underscore this distinction. All of their cited cases deal with restrictions on conduct involving contemporaneous expression inside the courtroom—specifically, protest activity and attorney speech. *See Huminski v. Corsones*, 396 F.3d 53, 63 (2d Cir. 2005) (restriction on displaying protest signs on courthouse grounds); *Mezibov v. Allen*, 411 F.3d 712, 719 (6th Cir. 2005) (restriction on attorney speech during judicial proceedings); *Berner v. Delahanty*, 129 F.3d 20, 22 (1st Cir. 1997) (restriction on attorney's ability to wear political buttons in court).[13] None of the cases deals with the type of First Amendment activity at issue here—namely, *documenting* court proceedings for the purpose of

---

[13] Most of these cases are inapposite for other reasons, as well. *Mezibov*, for instance, was not even decided on a public-forum rationale; rather, the court invoked the public-forum doctrine only to bolster its (unrelated) holding that an attorney is "not engaged in free expression" when "filing motions and advocating for his client in court." 411 F.3d at 720. And *Huminski* dealt with expressive conduct on courthouse grounds generally—rather than inside a courtroom specifically—and expressly acknowledged that citizens retain First Amendment rights inside courthouses. 396 F.3d at 89 n.34.

engaging in subsequent speech *outside* the courtroom. The magistrates' reliance on those cases therefore ignores a basic doctrinal reality: specifically, that the government's authority to restrict *some* types of First Amendment activity in a given forum does not empower it to restrict *all* types of First Amendment activity in that forum. *See, e.g., Int'l Soc. for Krishna Consciousness*, 691 F.2d at 161 ("[C]ivil rights protesters may keep a silent vigil in a segregated library, although they may not deliver a speech in the reading room.").

**B.      Even if the public-forum doctrine applied here, the Bail Fund would still prevail.**

Even if the bail-hearing courtroom could properly be characterized as a nonpublic forum, the ban on audio-recording would still be unconstitutional in this case. As this Court has recognized, the government's authority to restrict First Amendment activity in a nonpublic forum is not unfettered and must, instead, be "reasonable in light of the purpose of the for[um]." *Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 526 (3d Cir. 2004). This reasonableness test is "more exacting than the deferential rational basis standard." *Northeast Pa. Freethought Soc'y v. County of Lackawanna Transit Sys.*, 938 F.3d 424, 438 (3d Cir. 2019). Under this test, the government bears the burden of establishing that a given regulation is a reasonable means of advancing a purpose of the forum. *See Pomicter v. Luzerne Cty. Convention Ctr. Auth.*, 939 F.3d 534, 541-42 (3d Cir. 2019). This Court has

described this inquiry as "fact-intensive." *Id.* at 543 (quoting *New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 20 (1st Cir. 2002)).

Here, the magistrates have not met their burden of establishing that the recording ban is a reasonable means of advancing the purpose of the forum. The core purpose of the bail-hearing courtroom is to provide a venue where bail decisions can be made in full view of the public. As discussed above, the magistrates have not presented any evidence to show that the audio-recording ban actually serves that purpose. *See supra* Part III (explaining why the ban on audio-recording does not advance any of its stated purposes). As this Court has recognized, the government cannot rely on such thin justifications to limit expressive activity—even in a nonpublic forum. *See, e.g.*, *Pomicter*, 939 F.3d at 546-48 (striking down certain restrictions on profanity and voice-amplification in a convention-center concourse); *NAACP v. City of Philadelphia*, 834 F.3d 435, 444-48 (3d Cir. 2016) (striking down restriction on commercial advertisements inside airport terminal); *see also Miller v. City of Cincinnati*, 622 F.3d 524, 535-36 (6th Cir. 2010) (striking down certain restrictions on assemblages inside city hall).

What's more, the magistrates openly acknowledge that the ban's purpose is not to prevent disruptions to the bail hearings themselves but, rather, to restrict the dissemination of information about what happened at those public hearings. That goal is antithetical to basic First Amendment values and cannot serve as a basis for restricting the Bail Fund's protected activity—whether under the public-forum

doctrine or any other test. *See generally Craig*, 331 U.S. at 374 (stating that those "who see and hear what transpired [in open court] can report it with impunity"); *Fields*, 862 F.3d at 359 (explaining that the First Amendment "goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw" (citation omitted)).[14]

## V.    The magistrates overstate the impact of the District Court's ruling.

The magistrates contend that the District Court's ruling "has far-reaching statewide impact on over 500 magisterial district courts in Pennsylvania." Magistrates' Br. 52. But that concern ignores the fact that this case involves an *as-applied* challenge and that the District Court itself expressly stated that its ruling applied only to "the narrow circumstances present here." JA 28.

At any rate, even if the District Court's ruling swept as broadly as the magistrates claim, the ruling still would not burden other jurisdictions in the ways that the magistrates suggest. For example, the magistrates point to the supposed costs that other jurisdictions would incur in acquiring new recording equipment and producing

---

[14] Although the magistrates suggest that they are entitled to a "commonsense inference" that their proffered justifications are sufficient, the inferences they ask this Court to draw are not proper here in light of: (1) the ample record evidence refuting those justifications; and (2) their acknowledgement that the recording ban targets the free flow of information about public court proceedings. *See supra* Part III; *NAACP*, 834 F.3d at 446 ("The ability to use common sense is not a license to close our eyes and suspend disbelief.").

bail-hearing transcripts. But the District Court's ruling does not require any jurisdiction—not even Philadelphia—to undertake such efforts. *See* JA 31 (giving the magistrates the options to produce official audio recordings *or* create transcripts *or* permit the Bail Fund to make its own recordings). And, even if it did, the ruling would not preclude other jurisdictions from presenting evidence in a future case that they would face such burdens. In short, there is no reason to treat the district court's ruling in this case as dispositive in other cases that might present different factual situations.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be affirmed.

Respectfully submitted,

<div style="float:right">

*/s/  Nicolas Y. Riley*
NICOLAS Y. RILEY  (DC 1617861)
ROBERT D. FRIEDMAN
   Institute for Constitutional Advocacy
     & Protection
   Georgetown University Law Center
   600 New Jersey Avenue NW
   Washington, DC 20001
   Tel.: 202-662-4048
   Fax: 202-662-9248
   rdf34@georgetown.edu
   nr537@georgetown.edu

</div>

MICHAEL BERRY
PAUL J. SAFIER
SHAWN F. SUMMERS (*Of Counsel*)
   Ballard Spahr LLP
   1735 Market Street, 51st Floor
   Philadelphia, PA 19103
   Tel.: 215-665-8500
   Fax: 215-864-8999
   berrym@ballardspahr.com
   safierp@ballardspahr.com
   summerss@ballardspahr.com

*May 29, 2020*                                        *Counsel for Appellee*

49

## COMBINED CERTIFICATIONS

I hereby certify the following:

1.  At least one of the attorneys whose names appear on this brief is a member of the bar of this Court.

2.  This brief complies with the type-volume and typeface requirements of Federal Rule of Appellate Procedure 32(a).  This brief contains 12,685 words and was prepared in 14-point Garamond font, a proportionally spaced typeface, using Microsoft Word.

3.  On May 29, 2020, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

4.  The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

5.  This document was scanned for viruses using Windows Defender Antivirus, Version 1.317.194.0, and no virus was detected.


/s/ Nicolas Y. Riley
NICOLAS Y. RILEY
*Counsel for Appellee*

**ADDENDUM:**

**PERTINENT STATUTES & RULES**

# TABLE OF CONTENTS

Pennsylvania Rule of Criminal Procedure 112 ................................................ A1

Pennsylvania Rule of Criminal Procedure 523 ................................................ A3

Pennsylvania Rule of Criminal Procedure 524 ................................................ A5

Pa. Rule of Judicial Administration 1910 ........................................................ A7

Local Arraignment Court Rule 7.09 ............................................................... A11

**Pa. R. Crim. P. 112.**
**Publicity, Broadcasting, and Recording of Proceedings.**

**(A)** The court or issuing authority shall:

    **(1)** prohibit the taking of photographs, video, or motion pictures of any judicial proceedings or in the hearing room or courtroom or its environs during the judicial proceedings; and

    **(2)** prohibit the transmission of communications by telephone, radio, television, or advanced communication technology from the hearing room or the courtroom or its environs during the progress of or in connection with any judicial proceedings, whether or not the court is actually in session.

The environs of the hearing room or courtroom is defined as the area immediately surrounding the entrances and exits to the hearing room or courtroom.

**(B)** The court or issuing authority may permit the taking of photographs, or radio or television broadcasting, or broadcasting by advanced communication technology, of judicial proceedings, such as naturalization ceremonies or the swearing in of public officials, which may be conducted in the hearing room or courtroom.

**(C)** Except as provided in paragraph (D), the stenographic, mechanical, or electronic recording, or the recording using any advanced communication technology, of any judicial proceedings by anyone other than the official court stenographer in a court case, for any purpose, is prohibited.

**(D)** In a judicial proceeding before an issuing authority, the issuing authority, the attorney for the Commonwealth, the affiant, or the defendant may cause a recording to be made of the judicial proceeding as an aid to the preparation of the written record for subsequent use in a case, but such recordings shall not be publicly played or disseminated in any manner unless in a court during a trial or hearing.

**(E)** If it appears to the court or issuing authority that a violation of this rule has resulted in substantial prejudice to the defendant, the court or issuing authority, upon application by the attorney for the Commonwealth or the defendant, may:

    **(1)** quash the proceedings at the preliminary hearing and order another preliminary hearing to be held before the same issuing authority at a subsequent time without additional costs being taxed;

    **(2)** discharge the defendant on nominal bail if in custody, or continue the bail if at liberty, pending further proceedings;

**(3)** order all costs of the issuing authority forfeited in the original proceedings; or

**(4)** adopt any, all, or combination of these remedies as the nature of the case requires in the interests of justice.

*Comment:* This rule combines and replaces former Rules 27 and 328.

"Recording" as used in this rule is not intended to preclude the use of recording devices for the preservation of testimony as permitted by Rules 500 and 501.

The prohibitions under this rule are not intended to preclude the use of advanced communication technology for purposes of conducting court proceedings.

**Pa. R. Crim. P. 523.**
**Release Criteria.**

**(A)** To determine whether to release a defendant, and what conditions, if any, to impose, the bail authority shall consider all available information as that information is relevant to the defendant's appearance or nonappearance at subsequent proceedings, or compliance or noncompliance with the conditions of the bail bond, including information about:

  **(1)** the nature of the offense charged and any mitigating or aggravating factors that may bear upon the likelihood of conviction and possible penalty;

  **(2)** the defendant's employment status and history, and financial condition;

  **(3)** the nature of the defendant's family relationships;

  **(4)** the length and nature of the defendant's residence in the community, and any past residences;

  **(5)** the defendant's age, character, reputation, mental condition, and whether addicted to alcohol or drugs;

  **(6)** if the defendant has previously been released on bail, whether he or she appeared as required and complied with the conditions of the bail bond;

  **(7)** whether the defendant has any record of flight to avoid arrest or prosecution, or of escape or attempted escape;

  **(8)** the defendant's prior criminal record;

  **(9)** any use of false identification; and

  **(10)** any other factors relevant to whether the defendant will appear as required and comply with the conditions of the bail bond.

**(B)** The decision of a defendant not to admit culpability or not to assist in an investigation shall not be a reason to impose additional or more restrictive conditions of bail on the defendant.

*Comment:* This rule clarifies present practice, and does not substantively alter the criteria utilized by the bail authority to determine the type of release on bail or the conditions of release reasonably necessary, in the bail authority's discretion, to ensure the defendant's appearance at subsequent proceedings and compliance with the conditions of the bail bond.

When deciding whether to release a defendant on bail and what conditions of release to impose, the bail authority must consider all the criteria provided in this rule, rather

than considering, for example, only the designation of the offense or the fact that the defendant is a nonresident. Nothing in this rule prohibits the use of a pretrial risk assessment tool as one of the means of evaluating the factors to be considered under paragraph (A). However, a risk assessment tool must not be the only means of reaching the bail determination.

In addition to the release criteria set forth in this rule, in domestic violence cases under Section 2711 of the Crimes Code, 18 Pa.C.S. § 2711, the bail authority must also consider whether the defendant poses a threat of danger to the victim.

When a defendant who has been released on bail and is awaiting trial is arrested on a second or subsequent charge, the bail authority may consider that factor in conjunction with other release criteria in setting bail for the new charge.

**Pa. R. Crim. P. 524.**
**Types of Release on Bail.**

**(A)** If bail is set pursuant to Rule 520, the defendant shall be eligible for the following types of release on bail. The bail authority, after considering the release criteria in Rule 523, shall determine the type or combination of types of release on bail reasonably necessary, in the bail authority's discretion, to ensure that the defendant will appear at all subsequent proceedings and comply with the conditions of the bail bond.

**(B)** All of the types of release in paragraph (C) shall be conditioned upon the defendant's written agreement to appear and to comply with the conditions of the bail bond set forth in Rule 526(A).

**(C)** The types of release on bail are:

**(1)** *Release On Recognizance (ROR):* Release conditioned only upon the defendant's written agreement to appear when required and to comply with the conditions of the bail bond in Rule 526(A).

**(2)** *Release on Nonmonetary Conditions:* Release conditioned upon the defendant's agreement to comply with any nonmonetary conditions, as set forth in Rule 527, which the bail authority determines are reasonably necessary to ensure the defendant's appearance and compliance with the conditions of the bail bond.

**(3)** *Release on Unsecured Bail Bond:* Release conditioned upon the defendant's written agreement to be liable for a fixed sum of money if he or she fails to appear as required or fails to comply with the conditions of the bail bond. No money or other form of security is deposited.

**(4)** *Release on Nominal Bail:* Release conditioned upon the defendant's depositing a nominal amount of cash which the bail authority determines is sufficient security for the defendant's release, such as $1.00, and the agreement of a designated person, organization, or bail agency to act as surety for the defendant.

**(5)** *Release on a Monetary Condition:* Release conditioned upon the defendant's compliance with a monetary condition imposed pursuant to Rule 528. The amount of the monetary condition shall not be greater than is necessary to reasonably ensure the defendant's appearance and compliance with the conditions of the bail bond.

*Comment:* The decision as to what type or combination of types of release on bail is appropriate for an individual defendant is within the discretion of the bail authority, using the criteria set forth in Rule 523.

Consistent with existing practice, the bail authority must initially determine whether the defendant is likely to appear at subsequent proceedings and comply with the conditions of the bail bond set forth in Rule 526(A) if released on ROR.

The bail rules prior to the 1995 reorganization required a defendant to be released on ROR when the most serious offense charged was punishable by a maximum sentence of imprisonment of not more than 3 years, the defendant was a resident of the Commonwealth, the defendant posed no threat of immediate physical harm to himself or herself or others, and the bail authority had reasonable grounds to believe that the defendant would appear as required. Cases that fall within similar parameters under the new rules adopted in 1995 should continue to be treated in the same manner.

If the bail authority determines that ROR will not reasonably ensure the defendant's appearance and compliance with the conditions of the bail bond, see Rule 526(A), the bail authority should consider which other type or combination of types of release on bail, as provided in paragraphs (C)(2)-(5) of this rule, will be sufficient to reasonably ensure the defendant's appearance and compliance, taking into consideration facts specific to the individual defendant, such as the need to abstain from the use of alcohol or drugs.

Nominal bail may be used as an alternative to releasing a defendant on his or her own recognizance when it is desirable to have a surety. It should be used when the bail authority believes the defendant is a sufficiently good bail risk so as not to require the imposition of nonmonetary conditions of release or a monetary condition in a significant amount, but is not sufficiently reliable for ROR. The purpose of the surety is to facilitate interstate apprehension of any defendant who absconds by allowing the nominal surety the right to arrest the defendant without the necessity of extradition proceedings. *See Frisbie v. Collins*, 342 U.S. 519 (1952). A bail agency may be the nominal bail surety, as well as private individuals or acceptable organizations. In all cases, the surety on nominal bail incurs no financial liability.

Nonmonetary conditions may be used in conjunction with a monetary condition.

No condition of release, whether nonmonetary or monetary, should ever be imposed for the sole purpose of ensuring that a defendant remains incarcerated until trial. *See* Standard 10-5.3, ABA Standards for Criminal Justice, Chapter 10, Pretrial Release. However, bail may be initially denied, or subsequently modified or revoked, if the bail authority determines such action is necessary to ensure the defendant's appearance and compliance.

A6

**Pa. R. Jud. Admin. 1910.**
**Publicity, Broadcasting, and Photography in the Courtroom.**

**A.  General Statutory Prohibition.** It is unlawful and a criminal offense to use or operate a device to capture, record, transmit or broadcast a photograph, video, motion picture or audio of a proceeding or person within a judicial facility or in an area adjacent to or immediately surrounding a judicial facility without the approval of the court or presiding judicial officer or except as provided by rules of court. *See* 18 Pa.C.S. § 5103.1 (relating to unlawful use of an audio or video device in court).

**B.  General Rule.** Unless otherwise provided by this rule or by the Supreme Court of Pennsylvania, judges shall prohibit broadcasting, televising, recording or taking photographs in the courtroom and areas immediately adjacent thereto during sessions of court or recesses between sessions, except that a judge may authorize:

   **(1)** the use of electronic or photographic means for the presentation of evidence, for the perpetuation of a record or for other purposes of judicial administration;

   **(2)** the broadcasting, televising, recording, or photographing of investitive, ceremonial, or naturalization proceedings;

   **(3)** the photographic or electronic recording and reproduction of appropriate court proceedings under the following conditions:

      **(a)** the means of recording will not distract participants or impair the dignity of the proceedings;

      **(b)** the parties have consented; and the consent to being depicted or recorded has been obtained from each witness appearing in the recording and reproductions;

      **(c)** the reproduction will not be exhibited until after the proceeding has been concluded and all direct appeals have been exhausted; and

      **(d)** the reproduction will be exhibited only for instructional purposes in educational institutions.

   **(4)** the use of electronic broadcasting, televising, recording and taking photographs in the courtroom and areas immediately adjacent thereto during sessions of court or recesses between sessions of any trial court nonjury civil proceeding; however, for the purposes of this subsection, "civil proceedings" shall not be construed to mean a support, custody or divorce proceeding. Paragraphs (c) and (d) of Subsection (3) shall not apply to nonjury civil proceedings as heretofore defined. No witness or party who expresses any

A7

prior objection to the judge shall be photographed, nor shall the testimony of such witness or party be broadcast or telecast. Permission for the broadcasting, televising, recording and photographing of any civil nonjury proceeding shall have first been expressly granted by the judge, and under such conditions as the judge may prescribe in accordance with the guidelines contained in this rule.

*Note:* Temperate conduct of judicial proceedings is essential to the fair administration of justice. The recording and reproduction of a proceeding should not distort or dramatize the proceeding.

*See* the Internal Operating Procedures of the Supreme Court of Pennsylvania and the Commonwealth Court of Pennsylvania regarding broadcasting of proceedings by the Pennsylvania Cable Network.

In implementing this rule, the following guidelines shall apply:

    **a. Officers of Court**. The judge has the authority to direct whether broadcast equipment may be taken within the courtroom. The broadcast news person should advise the tipstaff prior to the start of a court session that he or she desires to electronically record and/or broadcast live from within the courtroom. The tipstaff may have prior instructions from the judge as to where the broadcast reporter and/or camera operator may position themselves. In the absence of any directions from the judge or tipstaff, the position should be behind the front row of spectator seats by the least used aisleway or other unobtrusive but viable location.

    **b. Pooling**. Unless the judge directs otherwise, no more than one TV camera should be taking pictures in the courtroom at any one time. Where coverage is by both radio and TV, the microphones used by TV should also serve for radio and radio should be permitted to feed from the TV sound system. Multiple radio feeds, if any, should be provided by a junction box outside of the courtroom, such as in the adjacent public hallway. It should be the responsibility of each broadcast news representative present at the opening of each session of court to achieve an understanding with all other broadcast representatives as to who will function at any given time, or, in the alternative, how they will pool their photographic coverage. This understanding should be reached outside the courtroom and without imposing on the judge or court personnel.

    Broadcast coverage outside the courtroom should be handled with care and discretion, but need not be pooled.

    **c. Broadcast Equipment**. All running wires used should be securely taped to the floor. All broadcasting equipment should be handled as

inconspicuously and quietly as reasonably possible. Sufficient file and/or tape capacities should be provided to obviate film and/or tape changes except during court recess. No camera should give any indication of whether it is or is not operating, such as the red light on some studio cameras. No additional lights should be used without the specific approval of the presiding judge, and then only as he may specifically approve.

**d. Decorum**. Broadcast representatives' dress should not set them apart unduly from other trial spectators. Camera operators should not move tripod-mounted cameras except during court recesses. All broadcast equipment should be in place and ready to function no less than five minutes before the beginning of each session of court.

## C. Law Enforcement Officers, Sheriff's Department Officers, and Judicial Security Officers.

**(1)** Unless expressly prohibited by local rule or order of court as authorized by Subsection (5), and except as otherwise provided in this Subdivision C, officers of law enforcement agencies, sheriffs and deputy sheriffs, and judicial security officers (referred to collectively as "Officers") may wear body cameras as part of their standard equipment and operate them as permitted by law or by state or local court rule, and as may be further authorized under the policies of the agency with which the Officer is associated.

**(2)** No body camera may be activated in a courtroom during judicial proceedings except when an Officer, in his or her professional opinion, determines that there is an actual or imminent emergency situation warranting activation in the ordinary course of his or her duties. In such an emergency situation, an Officer may activate his or her body camera until such time as, in his or her professional judgment, the emergency situation has concluded.

**(3)** When an Officer activates a body camera in a courtroom as permitted by paragraph (2), he or she shall verbally notify the presiding judge at the first reasonable opportunity after the body camera has been activated. Also, within one business day of the emergency incident, the Officer or his or her supervisor shall provide to the presiding judge a written report of the circumstances surrounding the activation of the body camera, including the times of activation and deactivation and an explanation of the Officer's actions. The presiding judge shall promptly share the activation report with judicial district court administration. The activation report also shall be provided to the law enforcement agency with which the Officer is associated.

**(4)** Any recording made in a courtroom during a judicial proceeding may not be released to anyone outside the court and the law enforcement agency with

which the Officer is associated without the express written approval of the president judge of the court. Use and dissemination of a recording made under this Subdivision C in connection with law enforcement activity shall require the express written approval of the president judge.

**(5)** A judicial district may adopt local rules or protocols regulating the use, operation and activation of body cameras in any location and space that is controlled by the judicial district and used in the ordinary course of its business, including a courtroom.

**(6)** A court and any law enforcement agency providing security services in the courtroom shall enter into a written agreement conforming to this rule and any local rule or protocol promulgated by the judicial district. At minimum, the agreement shall require the agency to (i) inform its officers of their responsibilities under the rule; (ii) provide training to its officers regarding the requirements of the rule, including training of new officers before they are permitted to activate a body camera in the courtroom; (iii) require annual written certification by a responsible representative of the law enforcement agency that the agency's officers have been informed of their responsibilities under the rule and have received proper training; and (iv) monitor their officers' compliance.

**(7)** Each law enforcement agency that provides security services to a court or judicial district shall provide to the district court administrator a copy of its current policies regarding use of body cameras, as well as a list of those Officers assigned to a court or judicial district who are qualified to wear and use body cameras.

**Local Arraignment Court Rule 7.09.**
**Broadcasting, Televising, Recording, Photography Restricted.**

An Arraignment Court Magistrate shall prohibit broadcasting, televising, recording, or taking photographs in the Courtroom or the areas immediately adjacent thereto during sessions or recesses between sessions, except that Arraignment Court Magistrates may authorize:

**(a)** the use of electronic or photographic means for the presentation of evidence, for the perpetuation of a record or for other purposes of judicial administration; and

**(b)** the broadcasting, televising, recording or photographing of investitive or ceremonial proceedings.